UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SWISS VILLAGE, INC., on behalf
of itself and in its representative
capacity on behalf of the current and
former member mobile homeowners
in the Park,

      Plaintiff,                            Case No.: 8:21-cv-00153

Vs.

LAWRENCE W. MAXWELL,
JAMES BRIAN ALTMAN,
RUSS LATTIN, CENTURY REALTY
FUNDS, INC., CHC, III LTD.,
MOBILE HOME LIFESTYLES, INC.,
A & M BUSINESS PROPERTIES,
INC., FLORIDA MANUFACTURED
HOUSING ASSOCIATION, INC.,
LUTZ, BOBO & TELFAIR, P.A.,
d/b/a Lutz, Bobo, Telfair,
Eastman & Bobo, f/k/a
Lutz, Webb & Bobo, P.A.,

      Defendants.
_____/

**AMENDED COMPLAINT AND JURY
TRIAL DEMANDED
(ADA CLAIM OMITTED)**

## TABLE OF CONTENTS

Page

I.  **INTRODUCTION** ................................................................ 4

    A.   Representative Action by the Swiss Village HOA .......... 5

    B.   The Nature of the Product or Service: "55 or Older" Mobile Home Park ......... 6

    C.   Sam Zell, Chairman of Equity Lifestyle, Likes the "Oligopoly" Nature of the Mobile Home Park Industry ......... 7

    D.   Geographic Area or the Market: Polk County, Florida ......... 8

II.  **DEFENDANTS** ................................................................ 8

    A.   The Maxwell/CRF Defendants ......... 8

    B.   The FMHA Trade Association Defendant ......... 11

    C.   The Lutz Bobo Law Firm Defendant ......... 12

III.  **JURISDICTION AND VENUE** ......... 12

IV.  **ACTS IN FURTHERANCE OF THE CONSPIRACY** ......... 13

    A.   Maxwell's Deceptive Self-promotion: Award Winning Developer ......... 13

    B.   Extort Adoption of an Illegal Long Term Rental Agreement ......... 17

    C.   Fraudulent and Illegal Ad Valorem Pass-Ons ......... 21

    D.   Illegal Fees or Charges and Conditions Upon Resale ......... 22

    E.   Defendants Illegally Coerce 8% of Gross Resale Price ......... 23

    F.   Unreasonable Elimination or Reduction in Services ......... 24

V.  **COUNT 1:  FLORIDA ANTITRUST ACT** ......... 28

VI.  **COUNT 2:  FLORIDA MOBILE HOME ACT** ......... 35

VII.  **JURY TRIAL DEMANDED** ......... 43

The Swiss Village, Inc., in its representative capacity on behalf of itself, and over 600 current and former mobile homeowners in the Swiss Village Mobile Home Park ("Park"), by and through the undersigned counsel, bring this Complaint against these Defendants, divided into three defined descriptive relationships:

- The **Maxwell/CRF Defendants**: Lawrence W. Maxwell, an individual, James Brian Altman, an individual, Russ Lattin, an individual, Century Realty Funds, Inc., a Florida corporation, CHC, III Ltd., a Florida limited partnership, Mobile Home Lifestyles, Inc., a Florida corporation, and A & M Business Properties, Inc., a Florida corporation;

- The **FMHA Trade Association Defendant**: Florida Manufactured Housing Association, Inc., a Florida corporation;

- The **Lutz Bobo Law Firm Defendant**: Lutz, Bobo & Telfair, P.A., a Florida corporation, d/b/a Lutz, Bobo, Telfair, Eastman & Bobo, f/k/a Lutz, Webb & Bobo, P.A.

The individuals and entity defendants described above are collectively referred to in this Complaint as "Defendants." The Plaintiff further alleges:

## I.    INTRODUCTION

1.    Beginning at a time uncertain, but at least as early as 2010, and continuing on through the present time, the Defendants have entered into and engaged in a conspiracy, combination, or concert of consciously parallel business conduct: a) in unreasonable restraint of trade and commerce within the State of Florida and elsewhere with effects in the State of Florida in violation of §542.18 of the Florida Antitrust Act of 1980; and b) to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce within the State of Florida and elsewhere with effects in the State of Florida in violation of §542.19 of the Florida Antitrust Act of 1980; by agreeing to the following:

    A.    Engage in and support Larry Maxwell's deceptive self-promotion: as an "Award Winning Developer";

    B.    Extort the Plaintiff into adoption of an illegal lot rental agreement;

    C.    Impose fraudulent and illegal ad valorem pass-Ons;

    D.    Impose illegal fees or charges and conditions upon resale;

    E.    Illegally coerce 8% of the gross resale price; and

F.      Unreasonably eliminated or reduced services.
Engaging in the business of owning and operating mobile home parks
within the State of Florida constitutes trade or commerce within the
meaning of Chapter 542, *Fla. Stat.*

2.      As a result of the unlawful conduct, the elderly mobile home
owners represented by the Swiss Village, Inc., suffered an antitrust
injury resulting in damages in excess of $30,000.00. This conspiracy,
combination, or concert of action resulted in higher mobile home lot rental
prices paid by elderly natural persons for the use of mobile home park
facilities than would have existed in a competitive market.

3.      Defendants' unlawful conduct is continuing and unless
equitable relief is granted artificially inflated mobile home lot rental prices
for the use of mobile home park facilities will continue unabated.

**A.      Representative Action by the Swiss Village HOA**

4.      Plaintiff Swiss Village, Inc., ("Swiss Village HOA"), is a Florida
not-for-profit corporation with its principal place of business located at
233 Alpine Dr., Polk County, Winter Haven, Florida. The Swiss Village
HOA is an incorporated mobile home owner association and the legal
representative under § 723.075 (1), *Fla. Stat.*, of all of the mobile home
owners in the Park "in all matters relating to the Florida Mobile Home

Act." *See* §§ 723.075(1) and 723.076(1) and "matters of common interest." *Rule* 1.222,[1] *Fla. R. Civil P.* The Plaintiff represents itself, and more than 600 current and former mobile homeowners in the Park. The relationship between the Swiss Village HOA, the homeowners represented by the Swiss Village HOA and the Park owner or operators is regulated under Chapter 723, *Fla. Stat.*, and encompasses a broadly defined "lot rental agreement" which includes, *inter alia*, a prospectus. (Exh. A is attached and adopted).

## B.   The Nature of the Product or Service: "55 or Older" Mobile Home Park

5.    The Park is an age 55 or older mobile home park with 380 mobile home rental residential lots. The Park is located at 365 Bern Drive, Polk County, Winter Haven, Florida. The Plaintiff mobile homeowners are largely elderly persons over 65 years of age. The mobile homes are valued between $25,000 and more than $100,000. Most homes are paid for with cash, usually comprising all or a substantial amount of the homeowners' life savings. They lease the lot underneath their mobile home from the Park

---

1       *Fla. R. Civ. P.* 1.222 Mobile Homeowners' Associations: A mobile homeowners' association may institute, maintain, settle, or appeal actions or hearings in its name on behalf of all homeowners *concerning matters of common interest*, including, but not limited to: the common property; structural components of a building or other improvements; mechanical, electrical, and plumbing elements serving the park property; and protests of ad valorem taxes on commonly used facilities. If the association has the authority to maintain a class action under this rule, the association may be joined in an action as representative of that class with reference to litigation and disputes involving the matters for which the association could bring a class action under this. Nothing herein limits any statutory or common law right of any individual homeowner or class of homeowners to bring any action which may otherwise be available. *An action under this rule shall not be subject to the requirements of rule 1.220. (Emphasis Added)*

owner or operators.

**C.    Sam Zell, Chairman of Equity Lifestyle, Likes the "Oligopoly" Nature of the Mobile Home Park Industry**

6.    Approximately 1.8 million Floridians today live in a mobile home. In a 2014 Tampa Bay Times newspaper article, it was noted that the population of Florida mobile homeowners represents five times the entire population of the city of Tampa, Florida. Most of those homeowners earn less than $30,000 per year. Largely, those mobile homeowners are a captive audience: "... As Frank Rolfe, a park owner who runs [the[ Mobile Home University, a boot camp for investors, told *Bloomberg*, 'We're like a Waffle House where everyone is chained to the booths." *Mobile home park investors bet on older, poorer America*, Tampa Bay Times, May 19, 2014.[2] "Years ago, the mobile home industry was mostly ignored save for a few investment titans. Warren Buffet paid $1.7 billion in 2003 to buy Clayton Homes, one of America's largest mobile home conglomerates. Sam Zell, the billionaire chairman of Equity Lifestyle Properties, Inc, said in a 2012 conference call he liked the 'oligopoly nature of our business.'" [referring to the mobile home park industry] *Id*. Equity LifeStyle Properties, Inc., its holding companies, and subsidiaries or affiliates directly or indirectly own, control, or operate 77 age-qualified Florida mobile home parks with

---

2    https://www.tampabay.com/news/business/realestate/mobile-home-park-investors-bet-on-older-poorer-america/2180277/

approximately 32,000 mobile home sites with gross revenues in excess of $230 million annually. The "Maxwell/CRF Defendants" Lawrence W. Maxwell, Century Realty Funds, Inc., CHC, III Ltd., Mobile Home Lifestyles, Inc., A & M Business Properties, Inc., James Brian Altman, and Russ Lattin directly or indirectly own, control, or operate 17 age-qualified Florida mobile home parks with approximately 6,000 mobile home sites with gross revenues in excess of $40 million annually.

### D.    Geographic Area or the Market: Polk County, Florida

7.    Polk County has a population of approximately 700,000 persons. Twenty per cent of the population is 65 years of age or older. There are 225 mobile home parks in Polk County, Florida. One hundred and twenty of those parks are "55 or older" mobile home parks which would market to a group of elderly retirees, such as those represented by the Swiss Village HOA.

## II.    DEFENDANTS

### A.    The Maxwell/CRF Defendants

8.    Defendant **Lawrence W. Maxwell ("Larry Maxwell")** is an individual domiciled at either 5375 Luce Rd., Lakeland, Polk County, Florida or 73 Mountain Lake, Lake Wales, Polk County, Florida. Larry Maxwell is the developer of the Park. Larry Maxwell is Chairman of

Defendant Century Realty Funds, Inc., and has served as Chairman, and at various dates, President, Vice President, director, and Chairman of Century Realty Funds, Inc., from 1995 to the present. Larry Maxwell was also engaged in business from 2017 through the present date as an operator of the Park as defined by § 723.003(16), *Fla. Stat.*

9.     Defendant **James Brian Altman ("Brian Altman")** is an individual domiciled at 5535 Spring Lake Dr., Lakeland, Polk County, Florida. Brian Altman is also engaged in business from 2007 through the present as an operator of the Park. In annual documents filed with the Florida Secretary of State, Brian Altman has been identified as a Vice President of Defendant Century Realty Funds, Inc., from 2014 to the present and Vice President of Defendant Mobile Home Lifestyles, Inc., from 2014 until the present. In his LinkedIn.com profile, he identifies himself as a Vice President of Century Companies and Director of Property Management from 2007 to the present.

10.     Defendant **Russ Lattin** is an individual domiciled at 7848 Habersham Dr., Lakeland, Polk County, Florida. Russ Lattin is an employee of Defendants Century Realty Funds, Inc., and Mobile Home Lifestyles, Inc., and is also an operator of the Park.

11.     Defendant **Century Realty Funds, Inc. ("CRF")** is a

Florida corporation with its principal place of business located at 500 S.

Florida Ave., Suite 700, Polk County, City of Lakeland, Florida. CRF is

the corporate entity at the center of the "Century Communities" and is

the parent company of the other subsidiary co-defendant entities. Larry

Maxwell is Chairman of CRF and has served as Chairman, President, Vice

President, and director of CRF from 1995 to 2014. Larry Maxwell's son,

Todd Maxwell, has been a Vice President of CRF since 1995. In 1999 Todd

Maxwell became President of CRF and served as such until 2010. He has

also been a director of CRF. CRF is the "mobile home park owner" of the

Park as defined by § 723.003(13), *Fla. Stat.*, which includes an "owner" or

"operator." CRF is also an operator of the Park.

12.    Defendant **CHC, III Ltd. ("CHC-III")** is a Florida limited

partnership with its principal place of business at 500 South Florida Ave.,

Suite 700, Polk County, Lakeland, Florida. CHC-III is directly or indirectly

owned or controlled by CRF and Larry Maxwell. CHC-III is the "mobile

home park owner" of the Park as defined by § 723.003(13), *Fla. Stat.*,

which includes an "owner" or "operator."

13.    Defendant **Mobile Home Lifestyles, Inc.,**

**("MHLifestyles")** is a Florida corporation with its principal place of

business at 500 S. Florida Ave., Suite 700, Polk County, City of Lakeland,

Florida. MHLifestyles is directly or indirectly owned or controlled by CRF, Larry Maxwell, Brian Altman, and Russ Lattin. MHLifestyles is an operator of the Park. The President and CEO of MHLifestyles is one of CRF's officers and directors, William Drost. Defendant Brian Altman is the Vice President of MHLifestyles.

14. Defendant **A & M Business Properties, Inc., ("A&M Properties")** a foreign (Ohio) Corporation with its principal place of business at 500 S. Florida Ave., Suite 700, Polk County, City of Lakeland, Florida. A&M Properties is controlled by CRF and Larry Maxwell. The CEO of A&M Properties is one of CRF's officers and directors, William Drost.

15. Defendants Larry Maxwell, Brian Altman, Russ Lattin, CRF, CHC-III, MHLifestyles, and A&M Properties are collectively referred to herein as the "Maxwell/CRF Defendants."

**B.    The FMHA Trade Association Defendant**

16. Defendant **Florida Manufactured Housing Association, Inc. ("FMHA Trade Association Defendant")** is a Florida corporation with its principal place of business at 1284 Timberlane Rd., Tallahassee, Florida. The FMHA Trade Association Defendant is a trade association for the Florida mobile home park owners.

11

### C.    The Lutz Bobo Law Firm Defendant

17.    Defendant **Lutz, Bobo & Telfair, P.A. ("Lutz Bobo Law Firm")**, d/b/a Lutz, Bobo, Telfair, Eastman & Bobo, f/k/a Lutz, Webb & Bobo, P.A., is a Florida corporation with its principal place of business located in Leon County, Florida at 2155 Delta Blvd., Suite 201B, Tallahassee, Florida and in Sarasota County, Florida at One Sarasota Tower, Two North Tamiami Trail, Fifth Floor, Sarasota, Florida. David Eastman, an attorney for the Lutz Bobo Law Firm, is the General Counsel for the FMHA Trade Association Defendant.

## III.    JURISDICTION AND VENUE

18.    Count One of this Complaint is an action for treble damages for violation of §§ 542.18 and 542.19 of the Florida Antitrust Act of 1980, Chapter 542, *Fla. Stat.*, in accord with § 542.22, *Fla. Stat.*, and for injunctive or other equitable relief in accord with § 542.23, *Fla. Stat.* This Court has jurisdiction of this claim under § 542.30, *Fla. Stat.* This Court also has personal jurisdiction over each Defendant under § 48.193, *Fla. Stat.*, because, among other reasons, each Defendant operates, conducts, engages in, or carries on a business or business venture in the State of Florida or has an office in the State of Florida or has committed a tortious act or acts within the State of Florida. Plaintiff also seeks relief in Count

Two under the Florida Mobile Home Act, Chapter 723, *Fla. Stat.* is This

Court also has personal jurisdiction over each Defendant under § 48.193,

*Fla. Stat.*, because, among other reasons, each Defendant operates,

conducts, engages in, or carries on a business or business venture in the

State of Florida or has an office in the State of Florida or has committed

tortious acts within the State of Florida.

19.    Venue is proper under §§ 47.011, 47.021, and § 542.30, *Fla.*

*Stat.*

20.    Plaintiff seeks damages in excess of $30,000.00, injunctive

or other equitable relief, attorneys' fees, and costs on behalf of the

represented mobile homeowners.

## IV.    ACTS IN FURTHERANCE OF THE CONSPIRACY

### A.    Maxwell's Deceptive Self-promotion: Award Winning Developer

21.    Larry Maxwell and Mark Schreiber were long-term friends,

hunting companions, and business colleagues. Together and through Larry

Maxwell's main corporate entity, CRF, he and Mark Schreiber entered into

various real estate partnership projects in Polk County and Central Florida

over the past twenty plus years.

22.    Larry Maxwell and Mark Schreiber extensively discussed

creating retirement communities in Polk County owned in part by

Schreiber and/or entities owned, operated, or managed by companies

affiliated with Larry Maxwell and Mark Schreiber. These entities were and

are currently marketed to the public as retirement community real estate

developers or developments under the general trade name of "Century

Communities." The Maxwell/CRF Defendants own, operate, or control—

directly or indirectly—seventeen age-qualified mobile home parks in Polk

County, Florida.

23.    Included in the "orbit" of CRF Communities were various

legal entities (including limited liability companies, partnerships,

limited partnerships, family partnerships, and corporations) that were

traditionally setup at the behest and direction of Larry Maxwell.

24.    Larry Maxwell left the formation (including naming) and

organization of those legal entities to their lawyer.

25.    In every instance, the place of business for these entities was

at the Century Plaza, 500 S. Florida Avenue, Lakeland, Florida. That same

building is owned by CRF or an affiliated company and has housed the bulk

of CRF's administrative employees, corporate officers or directors, and

lawyers - all of whom service Larry Maxwell and CRF. In most instances,

the various and numerous entities comprising CRF Communities used the

same office suites and telephone numbers as part of their business address and contact information.

26.    Larry Maxwell and Mark Schreiber planned, *inter alia*, the concept of the Park, which was expected to include 380 mobile home lots, a large and impressive clubhouse, pool, and offices (for sales staff and homeowner activities).

27.    The Maxwell/CRF Defendants advertise or promote the Park as part of the "CRF Communities" or "Century Communities" or "Century Companies" which, along with CRF, are described as "Florida's premier developer of affordable award-winning active-adult communities." The Park is advertised in marketing brochures and on the Internet as: "Another award-winning CRF Active Adult Retirement Community."

28.    According to Sunshine State Senior Citizen Magazine, CRF was "recognized nationally" as "Manufactured Home Community Developer/Operator of the Year" and among the "Top 50 Outstanding Master-Planned Residential Developments' for active adults!"

29.    Prior to the award, Sunshine State Senior Citizen Magazine, and its associated trademark (inactive since 1959), were acquired by Larry Maxwell's son, Lawrence T. "Todd" Maxwell through another of his corporate shells: Defendant MHLifestyles.

15

30.    The Maxwell/CRF Defendants caused the following marketing brochures and correspondence to be published or distributed to prospective mobile homeowners (including the Plaintiff) and the public via United States mail. These materials misrepresented that: "CRF Communities have been recognized nationally among the 'Top 50 Outstanding Master-Planned Residential Developments' for active adults!" These materials were mailed by the Maxwell/CRF Defendants and received by the Plaintiff. Since these dates these brochures have been continuously mailed to prospective homeowners and handed out in the community.

31.    The Maxwell/CRF Defendants caused the following marketing information to be published or distributed to Plaintiff and the public via the Internet stating: "CRF Communities have been recognized nationally among the 'Top 50 Outstanding Master-Planned Residential Developments' for active adults!" In particular, this misrepresentation was published via the Internet on or about June 2016 as follows:

> ...The solid foundation available only in a family owned and operated environment, as well as the diversity of ideas and determination to provide the very best product available, have culminated in the development of Florida Retirement communities that **have been recognized nationally among the "Top 50 Outstanding Master-Planned Residential Developments" for active adults!** .

Weblink: https://web.archive.org/web/20160602102028/http://

16

crfcommunities.com/ (Emphasis Added)

## B. Extort Adoption of an Illegal Long Term Rental Agreement

32.    In August 2018, the Maxwell/CRF Defendants—outside of either statutory meetings or confidential mediation efforts—extorted the representative Swiss Village HOA to adopt an illegal standardized three year lot rental agreement ("LTA") authored and drafted by an attorney or attorneys working for or on behalf of the Lutz Bobo Law Firm Defendant. The FMHA Trade Association Defendant encouraged distribution and discussion of the terms of the LTA among its assembly of mobile home park owners. A copy of the form or standardized LTA provided to the Swiss Village HOA by Brian Altman via email on April 4, 2018 is attached as Exhibit B and adopted.

33.    The standardized LTA extorts and injures the Plaintiff by requiring them to forfeit their statutory and constitutional protections and remedies. For example, Section 2 of the standardized LTA required, in direct contravention of the Florida Mobile Home Act, that if the Swiss Village HOA contended that CHC-III was in violation of the LTA, the prospectus, any rental agreement, or the Florida Mobile Home Act, the Swiss Village HOA must notify CHC-III in writing of the facts "giving rise

to and constituting such alleged Non-Compliance" by certified mail within ninety days of the date the Swiss Village HOA received reasonable notice of such facts. The LTA then provided CHC-III forty-five days from receipt of the notice to "cure" the alleged non-compliance. Upon completion of any such cure, CHC-III was to be "deemed" not to have been in default or in violation.

34.    Section 2 of the LTA further required, in direct contravention of the Florida Mobile Home Act, that the ninety day notice and forty-five day opportunity to cure provisions be deemed to be a condition precedent to any legal action.

35.    Section 3 of the LTA prohibited, in direct contravention of the Florida Mobile Home Act, an award of attorneys' fees or costs in any proceeding "by or on behalf of any former or current Homeowner seeking to invalidate or otherwise dispute the validity of the [LTA]." Further, section 3 of the LTA required, in direct contravention of the Florida Mobile Home Act's statutory declaration of a fiduciary relationship between the Swiss Village HOA and the Plaintiff homeowners, the Swiss Village HOA and CHC-III to "mutually enforce this Agreement and cooperate fully in the event the validity or integrity of this Agreement is attacked or disputed by any such Homeowner."

36.    Section 4 of the LTA required, in direct contravention of the

Florida Mobile Home Act, that any controversy or claim related to the LTA

shall first require non-binding mediation under either § 723.038, *Fla. Stat.*,

or Chapter 44, *Fla. Stat.*

37.    Section 4 of the LTA also required, in direct contravention

of the Florida Mobile Home Act, the Florida Constitution, and the U.S.

Constitution, that in any court proceeding "arising out of or relating to" the

LTA, the parties must waive their right to a jury trial.

38.    Section 5 "Mutual Release" of the LTA expressly releases,

in direct contravention of the Florida Mobile Home Act, the Defendants

(along with a broad litany of unknown and unidentified persons and

entities) and:

> ... their parents, affiliates, subsidiaries, officers, directors,
> agents, stockholders, members, attorneys, successors and
> assigns from any and all claims, actions or causes of action
> of any kind whatsoever ("Claims"), whether legal, equitable,
> administrative, or otherwise, which the Association now has
> or ever had including, but not limited to, Claims involving
> or relating to rents, services, maintenance, or Owner's
> compliance with or delivery of the Community's prospectuses,
> rental agreements, as well as any other alleged violation of
> Chapter 723, Florida Statutes. With the exception of Claims
> involving the subject matter of this Agreement, this release
> shall address only Claims existing on the Effective Date. This
> release shall not apply to any Homeowner's failure to pay rent
> or a rules violation.

39.     Section 6 of the LTA elevated the LTA, in direct contravention of the Florida Mobile Home Act, as controlling in the event of a conflict between the LTA and the prospectus or rental agreement.

40.     Section 6 of the LTA declared, in direct contravention of the Florida Mobile Home Act, that the LTA superseded all prior and contemporaneous discussions, negotiations, conditions or understandings relating to the LTA.

41.     The Maxwell/CRF Defendants' close relationships with the FMHA Trade Association Defendant and the Lutz Bobo Law Firm Defendant enable them to collaborate with other mobile home park owners and ultimately with each other to develop and expand state-wide adoption of the LTA by other mobile home park owners. In 2016 Attorney Allen Bobo, partner in the Lutz Bobo Law Firm Defendant, described that he worked closely with Eric Zimmerman, then Senior Vice President of Equity LifeStyle Properties, Inc., on revisions and implementation of LTAs identical to the LTA in the instant cause. In one instance, recited Bobo, a homeowner pointed to an ambiguity in the LTA favorable to their homeowner association. In response, Eric Zimmerman then quipped to Allen Bobo: "How did you miss that one, Allen?"

42.     In 2016, Florida Attorney Shawn Arbeiter disclosed that

Attorney Allen Bobo (then a partner and shareholder of the Lutz Bobo Law

Firm Defendant) had made numerous and regular annual presentations

to the FMHA Trade Association Defendant's annual meeting of Florida

mobile home park owners informing the assembly of "What is Dan Perry

up to now?" According to Arbeiter, those lengthy presentations by Bobo

included opinionated and disparaging remarks by Bobo and assembly

members of Perry's trial strategy including application of Chapter 501

(" FDUTPA") to lot rental, common area maintenance and LTA issues.

Attorney Bobo also disclosed that in an earlier and separate presentation

to the FMHA Trade Association Defendant assembly, he described the

existing statewide lot rents as "not high enough," explaining that if lot

rent increases were appropriately higher, that retiree mobile homeowners

would be filing lawsuits all over the state.

### C.    Fraudulent and Illegal Ad Valorem Tax Pass-ons

43.    The Maxwell/CRF Defendants illegally base the annual ad

valorem tax pass-on to the Plaintiff on insufficient and inaccurate interim

TRIM notices in violation of Section 723.031(5)(c), *Fla. Stat*. The Maxwell/

CRF Defendants, then, impliedly assert they may lawfully pass-on to the

Plaintiff ad valorem taxes for which payment has not yet been remitted.

The Maxwell/CRF Defendants continue to pass-on these illegal ad valorem

taxes every year. As of 2019 the cumulative improper and illegal pass-ons total more than $1,600,000.00. Exhibit C is attached and adopted.

44.    Since 1991 the Maxwell/CRF Defendants wrongfully and illegally included an $1.56 ad valorem tax pass into the Park base rent. That $1.56 has increased annually by the CPI and as of 2019, totals more than $62,000.00. Exhibit D is attached and adopted.

45.    The Maxwell/CRF Defendants are entitled to a four per cent discount for early payment of the Park's ad valorem taxes. The Maxwell/ CRF Defendants did not credit or reimburse the Plaintiff for the difference in the interim TRIM notice and then actual correct taxes or the four percent discount the Defendants received for their early tax payment until the following year. The Maxwell/CRF Defendants, then, impliedly assert they may lawfully deprive the Plaintiff of the annual float for the correct ad valorem taxes or the four percent discount and thus concealed their fraudulent withholding of the credit or reimbursement for each year. As of 2019 the cumulative improper and illegal float totals more than $106,000.00. Exhibit E is attached and adopted.

### D.    Illegal Fees or Charges and Conditions Upon Resale

46.    The following fees and charges "authorized" by the Prospectus and the Rules and Regulations were implemented or are enforced in an

illegal, arbitrary, discriminatory, retaliatory, or unreasonable manner by

the Maxwell/CRF Defendants in violation of the Florida and United States

Constitution and statutes, including the Florida Mobile Home Act, Chapter

723, *Fla. Stat.*, or otherwise unconscionable and oppressive:

- Tree Trimming/Removal - The Defendants engage in arbitrary and discriminatory reimbursement for tree trimming;

- Late Payment Charge - $1.50 per day after six days, retroactive to day one;

- Extra Resident Fee.

**E.    Defendants Illegally Coerce 8% of Gross Resale Price**

47.    The Maxwell/CRF Defendants illegally require mobile home

resale purchasers to sign closing documents purporting to grant the

Maxwell/CRF Defendants an exclusive six month resale contract on the

purchased home. Subsequently, when the mobile homeowner elects to use

another outside or third party resale agent, the Maxwell/CRF Defendants

insist upon receipt of eight per cent of the gross resales price, even if the

Maxwell/CRF Defendants have not expended any effort in marketing the

mobile home.

In a typical correspondence[3] to the outside or third party resales agent, Peter McFarlane, the attorney for the Maxwell/CRF Defendants wrote, in pertinent part:

*****

> This letter is to put you on Notice that Mobile Home Lifestyles, Inc has a six month exclusive RIGHT to SELL the home. If you and the resident disregard the RESALE AGREEMENT and you procure a Buyer for the home, Mobile Home Lifestyles, Inc. is entitled to a fee of 8% of the gross sales price of the mobile home or $1,500, whichever is greater. In accordance with the RESALE AGREEMENT, this fee is to be paid at closing. **If you refuse to cooperate with Mobile Home Lifestyles, Inc. in this matter, the community may bring legal action against you, personally, your real estate company, and the Seller. Additionally, we will be under no obligation to provide a Lease to the Buyer.** Thank you in advance for your cooperation.
>
> Sincerely,
> Peter A. McFarlane, P.A.
> Cc: Mr. Brian Altman, Mobile Home Lifestyles, Inc.

*****

Exhibit F is attached and adopted. (Emphasis Added)

## F.    Unreasonable Elimination or Reduction in Services

48.    The Park front security gates have been inoperative for weeks at a time in violation of §§ 723.022(2) and (4), *Fla. Stat*. The Maxwell/ CRF Defendants have allowed security to deteriorate to the point that the Plaintiff homeowners need security cameras, gate security cards, and/or

---

3    The quoted language in Exhibit F is taken from a letter regarding an adjacent mobile home park owned and operated by the Maxwell/CRF Defendants.

electronic surveillance.

49.    The Maxwell/CRF Defendants failed to maintain the Park security gates in violation of § 723.022(2), *Fla. Stat.*

50.    The Maxwell/CRF Defendants refuse to provide security at the storage compound and repair or maintain the Park security gates in violation of § 723.022(4), *Fla. Stat.* The unfettered public access to the Park through Hidden Cove West should be eliminated.

51.    The Park-wide sewer systems are in decay and break frequently in violation of §§ 723.022(2) and (4), *Fla. Stat.*

52.    The Maxwell/CRF Defendants refuse to maintain the Park-wide sewer systems in violation of § 723.022(2), *Fla. Stat.*

53.    The Maxwell/CRF Defendants refuse to provide operative sewer systems throughout the Park and repair or maintain the Park sewer systems in violation of § 723.022(4), *Fla. Stat.* A May 2020 letter from homeowner Steve George describing in detail the sewer system problems in one section of the Park is attached as Exhibit G and adopted.

54.    The Maxwell/CRF Defendants unreasonably eliminated or reduced services without an advance 90 day written notice or a corresponding reduction in lot rent in violation of Florida law, including, but not limited to:

A.    The Maxwell/CRF Defendants are unresponsive and have reduced maintenance;

    1.    Full-time maintenance staff reduced;

    2.    The Maxwell/CRF Defendants historically have not responded to many of phone calls, emails, and other correspondence;

    3.    The Maxwell/CRF Defendants do not request permission from homeowners before entering lots; do not uniformly enforce rules and regulations and are typically unavailable after normal business hours to enforce the rules and regulations;

B.    Pool, Hot-tub/spa

    1.    The Park swimming pools, hot tub, and filters are being cleaned improperly, causing homeowners to question their cleanliness;

C.    Security

    1.    The Maxwell/CRF Defendants have neglected to provide followup law enforcement's appearance or law enforcement standing permission to issue

trespass orders to strangers who enter the Park;

2.    The Park gates have been inoperative for weeks at a time;

D.    Common Areas - Facilities, lighting, landscaping, etc.

1.    In some sections of the Park drinking water tastes bad: some homeowners refuse to drink it unfiltered;

E.    Common Areas - Streets

1.    Streets throughout the Park are unsightly. Grass grows in some of the cracks in the pavement;

F.    "55 and Older" Park

1.    The Maxwell/CRF Defendants permitted children in the Park and the shared facilities in the Park to remain in excess of the limited 30 days duration requirements of the properly promulgated Park rules and regulations;

2.    The Maxwell/CRF Defendants have failed to supervise or restrict children in the shared facilities in the Park as required by the properly promulgated Park rules and regulations.

27

Underage and unlicensed persons frequently

drive golf carts;

## V.   COUNT I:  FLORIDA ANTITRUST ACT
### (Against All Defendants)
### §§ 542.18 and 542.19

55.   Plaintiff reallege and restate paragraphs 1 through 54 as if fully

set forth herein and further state:

56.   This is an action against the Maxwell/CRF Defendants,

the FMHA Trade Association Defendant, and the Lutz Bobo Law Firm

Defendant for their violation of the Florida Antitrust Act, Section 542.18,

*Fla. Stat.*

57.   Nearly 700,000 people own mobile homes in Florida mobile

home parks, spending in excess of approximately $4 billion annually on lot

rental and in excess of $20 billion on mobile home resale purchases. The

Maxwell/CRF Defendants directly or indirectly own, control, or operate 17

Florida mobile home parks with approximately 6,000 mobile home sites

with gross revenues in excess of $40 million annually.

58.   Since August 2016, the Maxwell/CRF Defendants,

(or one or more of its subsidiaries) leased mobile home lots to the

mobile homeowners represented by the Plaintiff, in a continuous and

28

uninterrupted flow of interstate trade or commerce, including through and into this judicial district within the meaning of the Florida Antitrust Act.

59.    The Maxwell/CRF Defendants, the FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendant knowingly—that is, voluntarily and intentionally—extorted under Florida law and attempted to entered into a continuing agreement, understanding, and conspiracy to raise, fix, maintain, and/or to impose a mobile home lot rental by subjecting the mobile homeowners, their representative mobile homeowner associations ("HOAs"), and the Park lot rental agreements to, among other things, impose an illegal Long Term Agreement ("LTA"), thereby reducing or eliminating price competition.

60.    To be clear, Plaintiff are not alleging that the Defendants, working with the FMHA Trade Association Defendant, conspired to fix the prices of mobile home lot rental amount at the same level. Instead, the Defendants, working with the FMHA Trade Association Defendant conspired to eliminate discounting of lot rental amount by ensuring that all park owners charged the same minimum price and used the same terms.[4] The Maxwell/CRF Defendants, the FMHA Trade Association Defendant,

_____

4       As the United States Supreme Court stated in *Catalano, Inc. v. Target Sales*, 446 U.S. 643, 648 (1980), an "agreement to eliminate discounts" "falls squarely within the traditional *per se* rule against price fixing." (Emphasis added)

and the Lutz Bobo Law Firm Defendant all share an interest in not reducing the lot rental amount.

61.    The scheme was anything but "unilateral." The conduct at issue here can be characterized as consciously parallel business conduct similar to how the United States Supreme Court characterized the conduct at issue in *United States v. General Motors Corp.*: "once the agreements were secured, General Motors both solicited and employed the assistance of its alleged co-conspirators in helping to police them. What resulted was a fabric interwoven by many strands of joint action to eliminate the discounters from participation in the market, to inhibit the free choice of dealers to select their own methods of trade and to provide multilateral surveillance and enforcement. This process for achieving and enforcing the desired objective can by no stretch of the imagination be described as `unilateral' or merely `parallel.'" 384 U.S. 127, 148 (1966)

62.    The FMHA Trade Association Defendant, as the Florida mobile home park owners' trade association represented by the Lutz Bobo Law Firm Defendant, has worked with the Maxwell/CRF Defendants and the Lutz Bobo Law Firm Defendant to develop and implement LTAs across Florida mobile home parks. That is, the FMHA Trade Association Defendant was in a position to communicate to each Defendant before it

implemented a LTA that its competitors also intended to do so.

63.    The Maxwell/CRF Defendants and the Lutz Bobo Law Firm Defendant' close relationships with the FMHA Trade Association Defendant enabled them to collaborate with other mobile home park owners and ultimately with each other to develop the LTA. In 2015 the Lutz Bobo Law Firm Defendant worked closely with Eric Zimmerman, then Senior Vice President of Equity LifeStyle Properties, Inc., on revisions and implementation of LTAs.

64.    The Maxwell/CRF Defendants and the Lutz Bobo Law Firm Defendant have tried to justify their conduct by claiming that the LTAs are simply "releases" to prevent litigation against mobile home park owners. That purported justification is pretextual—a fact that also supports an inference of conspiratorial conduct.

65.    Each of the Maxwell/CRF Defendants and the Lutz Bobo Law Firm Defendant had a motive to maintain high retail prices for mobile home lot rental amounts. In addition, in order to encourage independent mobile home park owners to adopt and implement LTAs, the Maxwell/CRF Defendants and Lutz Bobo Law Firm Defendant needed to keep the resale mobile home lot rental amounts high.

66.    The Maxwell/CRF Defendants, the FMHA Trade

Association Defendant, and the Lutz Bobo Law Firm Defendant have also demonstrated a past propensity to conspire against other mobile home park owners discounting mobile home lot rental amounts.

67.    The Maxwell/CRF Defendants, the FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendant' agreement to implement LTAs has harmed and continues to harm competition by increasing prices for the mobile home lot rental amounts made subject to them. Consumers ultimately pay the economic cost of this wrongful conduct in the form of higher prices for mobile home lot rental amounts affected by LTAs. The effect of the LTAs has been to limit consumer choice by depriving them of the ability to shop around for discounts on mobile home lot rental amounts.

68.    The Maxwell/CRF Defendants, the FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendant (and their co-conspirators) furthered and effectuated their conspiracy in the following ways, among others:

> A.    Participating in secret communications, discussions, and meetings in the U.S. to exchange confidential and competitively sensitive information regarding each other's lot rental amounts charged in their Florida

mobile home business;

B.  From time to time, discussing and agreeing during those conversations and meetings to set a price floor to be quoted to a mobile homeowner;

C.  Engage in and support Larry Maxwell's deceptive self-promotion: an award winning developer;

D.  Perpetuating the distribution of an illegal LTA which supports their fixed rent increases and violates Chapter 723, *Fla. Stat.*, and the homeowners' right to a civil jury trial in violation of the Florida and United States Constitution;

E.  Impose fraudulent and illegal ad valorem pass-ons;

F.  Impose illegal fees or charges and conditions upon resale;

G.  Illegally coerce eight per cent of the gross resale price; and

H.  Unreasonably eliminate or reduce services.

69.  As a direct and proximate result of the Maxwell/CRF Defendants, the FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendant' conduct, the Plaintiff have been harmed and will

continue to be harmed by paying supra-competitive lot rental amounts charged in Florida mobile home parks that they would not have paid in the absence of the Maxwell/CRF Defendants, the FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendant' conspiracy.

70.    The Maxwell/CRF Defendants, the FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendant' combination, conspiracy, acts, and practices, or the effects thereof, are continuing and will continue and are likely to recur unless permanently restrained and enjoined.

### RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests the following relief:

1.    A jury verdict for compensatory damages;

2.    A judgment against all defendants, jointly and severally, by the Court for treble the amount of the jury verdict and for attorney's fees, costs and interest as allowable by law for violations of the Florida Antitrust Act;

3.    An order that each defendant be permanently enjoined from future violations of Chapter 542, *Fla. Stat.*

4.    An order that the plaintiff be awarded its costs of this suit and reasonable attorney's fees pursuant to § 542.22(1), *Fla. Stat.*;

5.    A judgment and decree that the defendants have engaged in

an unlawful combination or a conspiracy restricting trade and commerce in

violation of § 542.18, *Fla. Stat.,* or to monopolize, attempt to monopolize,

or combine or conspire with any other person or persons to monopolize

any part of trade or commerce within the State of Florida and elsewhere

with effects in the State of Florida in violation of § 542.19, *Fla. Stat.*

6.    Award the Plaintiff such other and further equitable and legal

relief as the Court deems just and necessary.

**VII.   COUNT 2:  VIOLATION OF THE FLORIDA MOBILE HOME ACT, BREACH OF STATUTORY DUTIES, AND LOT RENTAL AGREEMENT**

**(Against Defendants CRF, CHC-III, MHLifestyles, A&M Properties, Larry Maxwell, Brian Altman, and Russ Lattin)**

**Chapter 723, *Fla. Stat.***

71.    Plaintiffs reallege and restate paragraphs 1 through 54 as if

fully set forth herein and further state:

72.    The CRF Defendants have unreasonably failed to comply with

the requirements of the applicable building, housing, and health codes by

permitting extensive stormwater flooding of the lots and common areas in

the Park.

73.    The Park continues to experience periodic flooding as a result

of improper drainage. Excessive water collects in the common areas, on

the mobile home lot, and under, around, and between the Homeowners'
homes. Improper grading and fill prevents proper drainage of the storm
water from under or around the Homeowners' homes. The CRF Defendants
have allowed storm water to run into the driveways and streets.

74.     The Plaintiffs and Homeowners have reported to the CRF
Defendants numerous instances of:

        A.     water under, around, and between the mobile homes;

        B.     water and mold or mildew damage to the mobile homes
            and personal property.

75.     The CRF Defendants have breached their duty to the
Homeowners by refusing to correct these flooding and drainage problems.

76.     The CRF Defendants have breached their duty to permit
the Homeowners to peacefully and quietly enjoy the possession of the
premises.

77.     The CRF Defendants failed to maintain utility connections
and systems for which the Park Owner is responsible in proper operating
condition.

78.     The CRF Defendants have unreasonably failed to maintain
the stormwater drainage system in the Park and its attendant utility
connections and systems in proper operating condition as evidenced by the

extensive and repeated flooding of the lots and the Park common areas.

79.    The CRF Defendants failed to maintain the common areas in a good state of appearance, safety, and cleanliness.

80.    The CRF Defendants have unreasonably failed to maintain the common areas in a good state of appearance, safety, and cleanliness as evidenced by the unreasonable elimination or reduction of services and facilities, including, but not limited to, the extensive and repeated flooding of the lots and the Park common areas.

81.    The CRF Defendants failed to maintain buildings and improvements in common areas in a good state of repair and maintenance.

82.    The CRF Defendants have unreasonably failed to maintain the buildings and improvements in common areas in a good state of repair and maintenance as evidenced by the unreasonable elimination or reduction of services and facilities, including, but not limited to, the extensive and repeated flooding of the lots and the Park common areas. These instances include:

- The Park entrance sign is too small and nearly obscured by tree growth;

- The wooden light poles on Matterhorn Street are weak structurally.

- The Park-wide water and sewage infrastructure periodically fails, causing raw sewage to be expelled into or around homes;

- The Park stormwater sewer grates are insufficiently sized to prevent significant water backup or "ponding" onto various lots in the Park.

- Newly paved roadways are improperly engineered. For example, crowns are convex (when they should be concave) thus directing runoff water away from storm sewer drains. Some Plaintiff homeowners have had to add, at their own unreimbursed expense, curbing to stop water intrusion;

- Many of the roadways have a "washboard" feel to golf cart operators.

- The clubhouse carpeting and underlayment are in a filthy and deteriorated condition. They need to be replaced with a commercial grade vinyl planking;

- The clubhouse kitchen and dance floor is in a deteriorated condition and needs to be replaced by commercial grade vinyl planking; and

- The Clubhouse air conditioning system is inadequate. The

windows on the West side of the Clubhouse need tinting.

83.    The CRF Defendants failed to provide access to the common areas at all reasonable times for the benefit of the Park residents and their guests.

84.    The CRF Defendants have unreasonably failed to provide access to the common areas, including buildings and improvements thereto, at all reasonable times for the benefit of the park residents and their guests as evidenced by the unreasonable elimination or reduction of services and facilities, including, but not limited to, the extensive and repeated flooding of the lots and the Park common areas, which interferes with the ingress and egress of the Homeowners and their guests to the lots and the common areas.

85.    The CRF Defendants failed to comply with properly promulgated Park rules and regulations.

86.    The CRF Defendants have breached their statutory and contractual duties and as a direct and proximate result have caused the Plaintiffs to suffer substantial and actual damages.

87.    The CRF Defendants have breached their duty to permit the Plaintiffs to peacefully and quietly enjoy the possession of their lot and the Park.

88.     The CRF Defendants have breached the lot rental agreement with the Plaintiffs, accompanying statutory warranty of habitability, and the express and implied covenant of peaceful and quiet enjoyment of their lots and the Park and as a direct and proximate result have caused the Plaintiffs to suffer substantial damages. These breaches include:

- The CRF Defendants refuse to heat the pool closest to the clubhouse to a "comfortable" temperature range of 74 to 80 during the months of December through April.

- The CRF Defendants have breached their promise to restore the current dock to its prior length of 260' with 52 boat slips. It is currently only 97' long with no boat slips.

- The CRF Defendants have breached their promise to replace the existing non-tournament style billiards' tables with a regulation-style tables.

- The Defendants need to replace the existing 256 clubhouse chairs with stacking style banquet chairs.

- The CRF Defendants must reimburse the Swiss Village HOA the $568 expenditure in 2019 for clubhouse card tables.

89.     The CRF Defendants have continually and repeatedly failed

to comply with the requirements of the applicable building, housing, and health codes. Absent action by this Court, Plaintiffs will suffer further or future irreparable harm.

90.    The CRF Defendants have continually and repeatedly failed to maintain utility connections and systems for which the park owner is responsible in proper operating condition. Absent action by this Court, Plaintiffs will suffer further or future irreparable harm.

91.    Plaintiffs have no adequate remedy at law to stop the further or future noncompliance with the requirements of the applicable building, housing, and health codes.

92.    Plaintiffs have no adequate remedy at law to stop the further or future failure to maintain utility connections and systems for which the park owner is responsible in proper operating condition.

93.    Plaintiffs have a clear legal right to prohibitory and mandatory injunctive relief.

94.    Permanent injunctive relief will serve the public interest.

95.    The CRF Defendants never provided a written ninety (90) day notice to the Plaintiffs that their services were going to be eliminated or reduced as required by § 723.037(1), *Fla. Stat.*

96.    The CRF Defendants failed to provide an advance 90 day

written notice to the Plaintiffs of their failure to maintain the common areas, improvements or buildings within the common areas in violation of § 723.037, *Fla. Stat.*

97.     The CRF Defendants have failed to comply with the terms and conditions in their lot rental agreements by improperly and unlawfully failing to provide a corresponding decrease in lot rental amount consistent with the reduction or elimination of services.

98.     The CRF Defendants have therefore breached their agreements with the Plaintiffs and caused them to suffer substantial losses and damages.

**RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests the following relief:

1.     A jury verdict for compensatory damages;

2.     A judgment against all defendants, jointly and severally, by the Court for treble the amount of the jury verdict and for attorney's fees, costs and interest as allowable by law for violations of the Florida Mobile Home Act;

3.     An order that each defendant be permanently enjoined from future violations of Chapter 723, *Fla. Stat.*

4.     An order that the plaintiff be awarded its costs of this suit and

*reasonable attorney's fees pursuant to § 723.068, Fla. Stat.;*

5.    A judgment and decree that the defendants have engaged in a violation of good faith and fair dealing in violation of § 723.021, *Fla. Stat.*

6.    Award the Plaintiff such other and further equitable and legal relief as the Court deems just and necessary.

## VIII. JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues triable by jury.

> Respectfully submitted,
>
> /s/ Daniel W. Perry
> DANIEL W. PERRY
> Florida Bar No. 376671
> dan@danielperry.com
> 4767 New Broad St #1007
> Orlando, FL 32814-6405
> Main: (407) 894-9003
> Counsel for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 2, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

> s/ Daniel W. Perry
> Attorney